**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:22-cv-00143-MR-WCM**

| | | |
|---|---|---|
| **REBECCA MICHELLE HAMRICK,<br>individually and as parent<br>of minors A.H. and K.H., and<br>HAYLEY HARRISON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF<br>DECISION AND ORDER** |
| | ) | |
| **RUTHERFORD COUNTY, JOHN<br>CARROLL in his individual capacity,<br>KIMBER DOVER-JACKSON, in her<br>individual capacity, and KELSEY<br>FERGUSON, in her individual<br>capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** is before the Court on the Motion for Summary

Judgment filed by the Defendants Kimber Dover-Jackson and Kelsey

Ferguson [Doc. 31].

## I.     PROCEDURAL BACKGROUND

This action arises from the use of a Temporary Parental Safety

Agreement (TPSA) entered into between the Plaintiff Rebecca Michelle

Hamrick ("Michelle") and the Rutherford County Department of Social

Services (DSS).    Michelle and her eldest daughter, Hayley Harrison

("Hayley"),[1] brought this action against Rutherford County; John Carroll, the director of Rutherford County DSS ("Carroll"); Kimber Dover-Jackson, a Rutherford County DSS supervisor ("Dover-Jackson"); and Kelsey Ferguson, a Rutherford County DSS social worker ("Ferguson"), asserting the following claims: (1) violations of their Fourteenth Amendment substantive and procedural due process rights pursuant to 42 U.S.C. § 1983; (2) violations of their Fourth Amendment rights to be free from unreasonable seizures pursuant to § 1983; (3) gross negligence, (4) negligent misrepresentation; (5) gross negligent supervision (against Defendant Dover-Jackson only); (6) actual fraud; (7) civil obstruction of justice; and (8) punitive damages. [Doc. 1].

The Court previously granted a motion to dismiss filed by Defendants Rutherford County and Carroll, and all of the Plaintiffs' claims against these Defendants were dismissed in their entirety. [Doc. 17]. As such, only Dover-Jackson and Ferguson remain as Defendants in the case. Dover-Jackson and Ferguson now move for summary judgment as to all claims asserted against them. [Doc. 31]. The Plaintiffs have filed a Response in opposition

---

[1] Hayley was a minor at the time of the events in question but has since reached the age of majority.

to the Defendants' Motion [Doc. 37], and the Defendants have filed a Reply [Doc. 40].  Having been fully briefed, this matter is now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'"  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 814 (1994).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who

must convince the Court that a triable issue does exist.  Id.  In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III.    FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiffs, the following is a recitation of the relevant facts.

Michelle has three children with Dustin Harrison ("Dustin"): Hayley Harrison, A.H., and K.H. (collectively, "the Harrison Children").  [Doc. 32-3: Hamrick Dep. at 9].  In the summer of 2019, Michelle, Dustin, and the Harrison Children all lived together in a double-wide trailer in Mooresboro, North Carolina.  [Doc. 39-2: DSS Notes at 56-57].

On July 12, 2019, Dustin's mother reported to Rutherford County DSS that Michelle did not keep food in the home for the Harrison Children and Dustin to eat and that Michelle whipped the children with a belt.  [Doc. 39-3: DSS Intake Form].  DSS began its investigation into these allegations on July 14, 2019, when on-call DSS social worker Shannon Kennedy visited the Hamrick-Harrison home.  [Doc. 39-2: DSS Notes at 56-57].   At that time, Kennedy noted that the home was "very clean, well-organized and spacious"

and that there was "an appropriate amount of food in the kitchen."  [Id. at 57].

During this visit, however, Kennedy observed multiple holes punched in the

walls, and Hayley told her that she was tired of her parents fighting all the

time.  [Id.; Doc. 32-4: Dover-Jackson Dep. at 8-9].  Hayley also disclosed

that her father punched straight through a microwave, and that he used

methamphetamine.  [Id.].  Michelle admitted that Dustin was on drugs and

would get violent and punch holes in the wall.  [Doc. 32-3: Hamrick Dep. at

26].  She reported that Dustin had threatened to kill himself in the past with

a knife.  [Doc. 39-2: DSS Notes at 61].  Michelle also told Kennedy that "if

she has to, she will kick Dustin out immediately before losing her children to

foster care" and that if Dustin's behavior worsened, she would involuntarily

commit him. [Doc. 33: DSS Notes at 61-62].  Kennedy then completed a

safety assessment with Michelle, whereby Michelle agreed that Dustin would

not be around the home with the children.  [Doc. 32-4: Dover-Jackson Dep.

at 60; Doc. 39-2: DSS Notes at 61-62].[2]

DSS assigned Defendant Ferguson to investigate the allegations made

by Dustin's mother.  [Doc. 37-2: Ferguson Dep. at 24-25; Doc. 39-2: DSS

_____

[2] Other than this reference to the safety assessment in the DSS case notes, there is no
record of a safety agreement or other related paperwork completed by Kennedy on July
12, 2019.  [See Doc. 37-2: Ferguson Dep. at 112-14; Doc. 32-4: Dover-Jackson Dep. at
41].

Notes at 53].  Defendant Dover-Jackson, Ferguson's supervisor at DSS, was also involved in the investigation.  [Doc. 32-4: Dover-Jackson Dep. at 26-27].

On July 15, 2019, Ferguson visited the Hamrick-Harrison house for the first time.  [Doc. 39-2: DSS Notes at 49; Doc. 37-2: Ferguson Dep. at 47].  During this visit, Ferguson learned that Michelle had involuntarily committed Dustin the night before because he was hallucinating and threatening to kill himself.  [Doc. 32-3: Hamrick Dep. at 24, 25; Doc. 39-2: DSS Notes at 49; Doc. 37-2: Ferguson Dep. at 47].  K.H. told Ferguson that a few months earlier, while Michelle was on a trip for work, K.H. found a meth pipe on the floor of the living room while Dustin was asleep in the recliner.  [Doc. 39-2: DSS Notes at 9].  At that time, Ferguson and Michelle completed another safety assessment, by which Michelle agreed to ensure a sober caretaker and ensure that the children were not exposed to domestic violence.  [Doc. 32-5: Ferguson Dep. at 29; Doc. 32-3: Hamrick Dep. at 31, 32].  While the resulting safety agreement does not appear in the record, Michelle recalled that the gist of the agreement was that "they didn't want Dustin in the house, and if something was to go on that—which [sic] I agreed to take the kids away from the situation."  [Doc. 32-3: Hamrick Dep. at 32].

Continuing her investigation, Ferguson later talked with Hayley at an aunt's house.  [Doc. 32-6: Harrison Dep. at 9].  Hayley stated that she stayed

6

at her aunt's home most of the time because she could have fun there and be a teenager. [Id. at 12]. Hayley told Ferguson that her parents fought all the time, and that it was aggravating to her siblings that her parents fought all the time. [Id. at 13]. Hayley stated that when she was at home, she worried about her parents fighting. [Id. at 15]. She also worried about her mom and siblings. [Id.]. Hayley stated that she "didn't want them to be fussing in front of my siblings and them have to go through that." [Id. at 16].

Dustin remained involuntarily committed until July 18, 2019. [Doc. 39-2: DSS Notes at 45]. When he was released, he went to live with his mother. [Id.; Doc. 37-2: Ferguson Dep. at 59; Doc.37-5: Harrison Dep. at 17].

Ferguson went back to the Hamrick-Harrison home on July 24. [Doc. 37-2: Ferguson Dep. at 47]. At that time, Ferguson informed Michelle that Dustin had told Ferguson that he was living in the Hamrick-Harrison house, which violated the safety agreement.[3] [Doc. 32-3: Hamrick Dep. at 34, 35]. Ferguson explained to Michelle the safety concerns with Dustin being in the home with their children, and that she needed to put in place a new safety agreement. [Doc. 32-5: Ferguson Dep. at 72]. Michelle signed a new safety agreement on July 24, 2019. [Doc. 32-3: Hamrick Dep. at 39-40]. In that agreement, Michelle acknowledged that one of DSS's main issues was

---

[3] Michelle denies that Dustin was in her home. [Doc. 32-3: Hamrick Dep. at 34].

having Dustin in the house with the children in light of Dustin's mental health issues and drug abuse. [Id. at 37].

At some point later on July 24, Ferguson received additional information that Dustin and Michelle were around each other at the family home, which in her view presented a safety risk to the children. [Doc. 37-2: Ferguson Dep. at 118]. According to Ferguson, the safety assessment in place was not strong enough to prevent harm to the children because Dustin and Michelle continued to be back around one another at their home with the children. [Id. at 77, 118]. Both Ferguson and Dover-Jackson agreed that a new safety assessment needed to be completed. [Doc. 32-4: Dover-Jackson Dep. at 107].

As a result, DSS workers, including Dover-Jackson, her supervisor and other members of the supervisory team, discussed whether custody was an option. [Id. at 113]. At this meeting, "custody was approved," meaning that DSS "could petition the courts and inquire, just provide the facts to the judge to see if he felt we had enough factual information to assume custody." [Id.]. After a plan to seek custody was approved internally, DSS contacted Michelle to conduct an emergency child family team meeting. [Id. at 120]. The purpose of the child family team meeting was to discuss DSS's concerns

and to explain to Michelle the temporary parental safety agreement process. [Id. at 120-21].

A temporary parental safety agreement, or TPSA, is "a voluntary, short-term agreement[ ] made between a parent and a county child welfare agency when there is a safety threat to a child in his or her home." [Doc. 32-3: NCDHHS Letter]. A parent may identify a temporary safety provider who can temporarily take care of the child while the safety threat exists. [Id.]. A TPSA cannot extend beyond the investigative process, and all assessments must be completed within forty-five days. [Id.]. At the completion of the forty-five day period, if DSS determines that abuse, neglect, or dependency has occurred, DSS decides whether immediate removal of the children is necessary. N.C. Gen. Stat. § 7B-302(c). If immediate removal is not necessary, DSS may offer protective services like counseling. Id.; N.C. Gen. Stat. § 7B-300. If the family refuses protective services, DSS may seek a juvenile petition. N.C. Gen. Stat. § 7B-302(c).

Ferguson called Michelle at work and told her that DSS "had made the decision to take the kids" and that she needed to get to Social Services with someone she trusted to put the children in their care. [Doc. 32-3: Hamrick Dep. at 29]. Michelle chose her mother and her sister (who lived with Michelle's mother) as temporary safety providers. [Id. at 30]. Michelle

9

arrived at DSS along with her mother, her sister, and Hayley.  [Id. at 38-39].

Ferguson informed Michelle that the previous safety agreement had been

violated by Michelle having Dustin in the home, a fact which Michelle

vehemently denied.  [Id. at 38, 42-43]. Ferguson explained to Michelle that

there were safety concerns with Dustin being in the home with the children,

and to eliminate those concerns it would be best for the children to reside in

temporary safety placement until Michelle could ensure there was no

domestic violence or substance abuse going on in the home.  [Doc. 32-5:

Ferguson Dep. at 34].

Michelle read the TPSA, which provided that she could revoke it at any

time.  [Doc. 32-3: Hamrick Dep. at 43; Doc. 39-6: TPSA].  Michelle

acknowledged that she can read and write, and that DSS went over the

TPSA with her.  [Doc. 32-3: Hamrick Dep. at 8, 72].  Ferguson told Michelle

that if she did not sign the agreement, there was enough evidence to file a

petition with the Court and that this could result in her kids being taken away.

[Id. at 50].  Upset and crying, Michelle told Dover-Jackson that DSS could

not take her kids.  [Doc. 39-1: Hamrick Dep. at 11].  In response, Defendant

Dover-Jackson told Michelle that DSS "had to" and then "threatened" that

DSS was "going to put [the kids] in DSS's custody" if she did not sign the

TPSA.  [Id. at 11-12].  Michelle felt that she "had no choice" but to sign the

TPSA and have her children go live with temporary safety providers. [Id. at 9]. Michelle's mother and sister also signed the TPSA "stating that they're aware of the concerns that DSS have, and they are aware that Michelle is making the plan for her children to reside with them until she is able to secure a safe and stable housing for her children." [Doc. 37-2: Ferguson Dep. at 30, 32; Doc. 39-6: TPSA]. When Michelle signed the TPSA, it was made clear to her that she could stay with the children at her mother's house and be with the kids by herself, but that she needed to make good decisions to keep them safe and in a safe environment. [Doc. 32-3: Hamrick Dep. at 52; Doc. 39-2: DSS Notes at 1].

The TPSA provides a number of statements of understanding, each of which Michelle initialed, indicating her assent thereto:

1. I (the parent or caretaker) agree that I participated in the development of and reviewed this safety agreement. I agree to work with the providers and services as described above.

2. My participation in this agreement is not an admission of child abuse or neglect on my part and cannot be used as an admission of child abuse or neglect.

3. I understand that I have the right to revoke and/or have the Temporary Parental Safety Agreement reviewed **at any time**.... I also understand that if a Safety Agreement cannot be agreed upon or if the actions in the Safety Agreement are not followed, the county child welfare agency may have the authority

to request that the court make a determination on how the child(ren)'s safety will be assured.

4. I (the parent or caretaker) confirm that this agreement does not conflict with any existing court order, or if I am affected by a court order, all parties affected by the court order agree to this safety agreement on a temporary basis.

5. I (the parent or caretaker) understand that [DSS] may refer for further services, may restrict access to my child(ren), or may ask the court to order that I complete services or place the child in foster care.

6. If a Temporary Safety Provider is utilized, I understand that [DSS] will share my information with the Temporary Safety Provider for the safety and welfare of my child while the child lives in that home or the Temporary Safety Provider resides in the family home.

**7. This safety agreement will cease to be in effect when I am notified by my social worker or [DSS] is no longer providing services to my family during the assessment phase….**

[Doc. 39-6: TPSA at 8-9] (emphasis in original).

The Harrison Children went to live with their grandmother and aunt on July 24, 2019. [Doc. 32-3: Hamrick Dep. at 54]. Michelle stayed with the children every day, from the time that she left work until the time she went to bed at night. [Doc. 32-3: Hamrick Dep. at 54]. Ferguson informed Michelle that in order to dissolve the TPSA, she would need to take out a one-year domestic violence restraining order against Dustin in order to abate the risk

to her children.  [Id. at 44, 52-53].  Michelle obtained a restraining order the next day.  [Id. at 44; Doc. 39-2: DSS Notes at 2].  On August 7, approximately two weeks later, Ferguson visited Michelle's home and told her that the TPSA would be dissolved, as the restraining order was in place and Michelle and her children were engaging in therapy.  [Doc. 32-3: Hamrick Dep. at 55; Doc. 32-7: Dodd Dep. at 23-24].  The case was closed on August 19, 2019.  [Doc. 32-4: Dover-Jackson Dep. at 141].

## IV.  DISCUSSION

### A.  Section 1983 Claims

The Federal Civil Rights Act, 42 U.S.C. § 1983, imposes civil liability upon every person who, under color of law, deprives another of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. To prevail on a Section 1983 claim, the plaintiff has the burden of establishing (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law.  Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999). By its terms, § 1983 "creates no substantive rights; it merely provides remedies for deprivation of rights established elsewhere."  City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985) (citation omitted).

Here, the Plaintiffs assert claims under § 1983 for violations of their substantive and procedural due process rights under the Fourteenth Amendment, as well as their rights to be free from unreasonable seizures in violation of the Fourth Amendment. At the heart of each of these federal constitutional claims is the Plaintiffs' contention that the TPSA—pursuant to which Michelle agreed for the Harrison Children to reside with relatives while DSS investigated allegations of abuse and neglect—constituted an unlawful removal of the children and therefore a deprivation of a recognized liberty interest. [See Doc. 1: Complaint at ¶¶ 78-79 (alleging that Michelle was deprived of the "right to custody of her children" and that the children were deprived of the right to "live with their parents and be parented by their parents").[4] The Supreme Court has stated that the "interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized." Troxel v. Granville, 530 U.S. 57, 65 (2000). Indeed, "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." Hodge v. Jones, 31 F.3d 157, 163 (4th Cir.

---

[4] While the Plaintiffs' Complaint couches the claimed liberty interest of the children in terms of their right to live with "their" parents, [id. at ¶ 79], the Plaintiffs make no argument that the deprivation of the children's right to live with their father constituted a constitutional violation.

14

1994); <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982).  Thus, the Plaintiffs have recognized liberty interests in maintaining the integrity of their family unit.  <u>See</u> <u>Weller v. Dep't of Social Servs. for City of Baltimore</u>, 901 F.2d 387, 395 (4th Cir. 1990) ("It is clear that the private, fundamental liberty interest in retaining the custody of one's child and the integrity of one's family is of the greatest importance.").  These fundamental interests, however, are "neither absolute nor unqualified, and may be outweighed by a legitimate governmental" interest, including curtailing child abuse and neglect.  <u>Hodge</u>, 31 F.3d at 163-64; <u>see</u> <u>Weller</u>, 901 F.2d at 392 (noting that parents' fundamental right in the custody, care, and control of their children "does not categorically bar the government from altering parental custody rights").

Critically, Michelle was never deprived of the custody of her children. DSS proposed the temporary safety plan to Michelle in order to immediately address serious safety issues—namely, Dustin's drug use and mental health issues, as well as domestic violence between the parents—which, if left unaddressed, would have resulted in the filing of a juvenile petition.  Notably, the TPSA did not purport to alter Michelle's custody rights to the children in any way.  Michelle was permitted to stay with the children and had unrestricted access to them during the fourteen days while they resided with their grandmother and aunt.  The living arrangement contemplated by the

TPSA was a temporary measure to ensure the safety of the children while Michelle took steps to address the issues of drug use and domestic violence within her home.[5]  As such, the Plaintiffs have failed to present a forecast of evidence from which a reasonable jury could conclude that the children were removed from Michelle's custody by virtue of the TPSA.  Without a sufficient forecast evidence of a "removal," the Plaintiffs' constitutional claims must fail. See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 276 (2d Cir. 2011) ("Where there is no actual loss of custody, no substantive due process claim can lie."); Frazier v. Williams, No. 15-CV-6531(KAM)(LB), 2016 WL 2644897, at *3 (E.D.N.Y. May 9, 2016) ("Where a state actor has not removed a child from a parent's custody, however, there has been no deprivation entitling a parent to procedural due process."); Romero v. Brown, 937 F.3d 514, 521-22 (5th Cir. 2019) (applying Fourteenth Amendment due process standards to Fourth Amendment claims for wrongful removal).

Even if the TPSA could be construed as somehow interfering with Michelle's custodial rights or the integrity of the Plaintiffs' familial relations, such interference does not rise to the level of a constitutional violation.  When

---

[5] In this respect, this case presents an entirely different situation than the one presented in Hogan v. Cherokee County.  In that case, the county department of social services presented the plaintiff father with a "Custody and Visitation Agreement" which purported to permanently transfer custody of the minor child to her grandfather without any court review and without any further investigation or services by the Department of Social Services.  See Hogan v. Cherokee County, 519 F.Supp.3d 263 (W.D.N.C. 2021).

officials remove a child from a parent's custody for the child's protection, only an "abuse of power which 'shocks the conscience' creates a substantive due process violation." Wolf v. Fauquier Cty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009) (internal citation omitted). While the Fourth Circuit has not given clear guidance on what "shocks the conscience" in a case involving the removal of children without a judicial order, it has held that an emergency removal "based upon some evidence of child abuse" does not shock the conscience. Weller, 901 F.2d at 391-92. Here, the parties have presented a forecast of evidence that DSS had reason to believe that Michelle and Dustin's domestic violence, as well as Dustin's ongoing drug use, presented an imminent risk of serious harm to the children and could have been the basis for DSS to file a juvenile petition seeking to have the children declared abused and/or neglected. Under these circumstances, the children's brief fourteen-day stay with their grandmother and aunt—which allowed Michelle the opportunity to take legal action to ensure that Dustin would not remain in the home—does not "shock the conscience."

Moreover, to the extent that the Plaintiffs' liberty interests were infringed by the TPSA, the undisputed forecast of evidence before the Court demonstrates that the Plaintiffs waived their rights when Michelle voluntarily assented to the agreement. See Waller, 901 F.2d at 393 ("If one voluntarily

surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation.").  Michelle selected the temporary safety providers and brought them to DSS with her for the emergency family meeting.  She had the opportunity to read and review the TPSA and had the terms explained to her. The TPSA clearly stated that the agreement could be revoked at any time, and it is undisputed that Michelle never sought to revoke the agreement during the time that her children resided with their grandmother and aunt.

The Plaintiffs contend that Michelle's assent to the TPSA was coerced and that she had "no choice" but to sign the agreement because the Defendants falsely threatened to take the children away and place them in foster care if she did not agree to the temporary safety plan.  While the Plaintiffs characterize the Defendants' statements regarding the potential of foster care as false threats, Michelle was told at the time that she signed the TPSA that DSS had enough evidence to seek a petition to have a court declare the children abused and/or neglected.  The TPSA also made clear that if the safety plan could not be agreed upon or if the actions in the plan were not followed, then DSS would have the authority to petition the court to make a determination as to how ensure the children's safety, including placing the children in foster care.  Thus, the Defendants' so-called "threats"

were merely an accurate restatement of what the TPSA (and North Carolina law) entitled DSS to seek under the circumstances. Moreover, because Michelle had the immediate right to revoke the TPSA, she could challenge any DSS action (and its basis) in court. As such, Michelle was not deprived of any procedural due process rights by virtue of the TPSA.

In sum, the Plaintiffs have failed to present a forecast of evidence from which a reasonable jury could conclude that the Defendants removed the Harrison Children from Michelle's custody or otherwise infringed on their liberty interests. Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' claims for violation of their Fourteenth and Fourth Amendment rights.[6]

### B.    State Law Claims

As noted above, the Plaintiffs assert claims of negligence, gross negligence, negligent misrepresentation, and obstruction of justice against Defendants Ferguson and Dover-Jackson, and claims of negligent/gross negligent supervision against Dover-Jackson only. The Plaintiffs concede that the Defendants are entitled to summary judgment with respect to the

---

[6] Because the Defendants did not violate any of the Plaintiffs' clearly established rights, the Defendants are also entitled to qualified immunity. See E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018). As such, summary judgment for the Defendants would also be proper on this ground.

19

Plaintiffs' obstruction of justice claim, [see Doc. 37: Pltfs' Memorandum in Opposition at 1 n.1], and therefore, this claim is dismissed. With respect to the remaining claims, the Defendants argue that such claims are barred by public official immunity.

Under North Carolina law, "[t]he public immunity doctrine protects public officials[7] from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984); see also Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless

---

[7] Under North Carolina law, social workers are public officials entitled to claim public official immunity. See Perry v. Pamlico Cty., 88 F.Supp.3d 518, 533 (E.D.N.C. 2015).

indifference to the rights of others." Grad, 312 N.C. at 313, 321 S.E.2d at 890-91.

Here, the Plaintiffs have failed to present a forecast of evidence that either Ferguson or Dover-Jackson acted maliciously, corruptly, or outside the scope of their official authority in investigating the allegations of abuse and neglect or in the manner in which they presented the TPSA to Michelle. The Plaintiffs' "mere allegations of gross negligence cannot defeat immunity." Bishop v. County of Macon, 620 F. App'x 148, 150 (4th Cir. 2015); Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir. 1994). Accordingly, the Plaintiffs' state law claims are all dismissed.

## ORDER

**IT IS THEREFORE ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 31] is **GRANTED**, and the Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Signed: July 29, 2024

Martin Reidinger
Chief United States District Judge